Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Christopher E. Stiner (SBN 276033)
cstiner@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ZACHARY SCHWARTZ and BERNADETTE LIONETTA, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>     v.<br><br>APPLE INC.,<br><br>              Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>**THE SHERMAN ACT – MONOPOLIZATION**<br><br>**THE SHERMAN ACT - ATTEMPTED MONOPOLIZATION**<br><br>**THE SHERMAN ACT – TYING**<br><br>**CALIFORNIA UNFAIR COMPETITION LAW**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION........................................................................................................1

JURISDICTION AND VENUE ................................................................................2

PARTIES....................................................................................................................3

FACTUAL BACKGROUND ....................................................................................4

ANTITRUST INJURY AND ANTICOMPETITIVE EFFECTS..........................10

SECURITY AND OTHER ALLEGED COUNTERVAILING FACTORS DO NOT JUSTIFY
   APPLE'S ANTICOMPETIVE CONDUCT ........................................................12

MARKET DEFINITIONS– THE SMARTPHONE AND SMARTWATCH INDUSTRIES..........12

   A.     Relevant Markets ................................................................................12

   B.     Apple has Monopoly Power in the Relevant Markets ..........................13

TOLLING OF STATUTE OF LIMITATIONS.......................................................16

CLASS ACTION ALLEGATIONS ........................................................................17

CAUSES OF ACTION ............................................................................................20

   FIRST CAUSE OF ACTION
   Violation of Sherman Act -- Monopolization
   (15 U.S.C. § 2)
   (Performance Smartphone Class)..........................................................20

   SECOND CAUSE OF ACTION
   Violation of Sherman Act – Attempted Monopolization
   (15 U.S.C. § 2)
   (Performance Smartphone Class)..........................................................22

   THIRD CAUSE OF ACTION
   Violation of Sherman Act -- Monopolization
   (15 U.S.C. § 2)
   (Smartphone Class) ..............................................................................24

   FOURTH CAUSE OF ACTION
   Violation of Sherman Act – Attempted Monopolization
   (15 U.S.C. § 2)
   (Smartphone Class) ..............................................................................26

   FIFTH CAUSE OF ACTION
   Violation of Sherman Act –Tying
   (15 U.S.C. §§ 1, 3)
   (Apple Watch Class) ............................................................................28

i

SIXTH CAUSE OF ACTION
Violation of the California Unfair Competition Law
(Cal. Business and Professions Code § 17200, *et seq.*)
(Limited to California iPhone and Apple Watch Subclasses)................................29

PRAYER FOR RELIEF..............................................................................................30

DEMAND FOR JURY TRIAL....................................................................................32

CLASS ACTION COMPLAINT

1.     Plaintiffs Zachary Schwartz and Bernadette Lionetta, on behalf of himself and all others similarly situated, brings this class action against Defendant Apple Inc. ("Defendant" or "Apple") in order to free smartphone markets from Apple's anticompetitive and exclusionary conduct; to restore competition and to lower smartphone prices for consumers; and to recover damages that he and other members of the putative class incurred by paying more for Apple's iPhones than they would have absent Apple's monopolization and exclusionary conduct, as alleged further below.

2.     In 2010, a top Apple executive emailed Steve Jobs, Apple's then-CEO, about an ad for the new Kindle e-reader. The ad began with a woman who was using her iPhone to buy and read books on the Kindle app. She then switches to an Android smartphone and continues to read her books using the same Kindle app. The executive wrote to Jobs: one "***message that can't be missed is that it is easy to switch from iPhone to Android. Not fun to watch.***"[1] According to the U.S. government, Jobs was clear in his response: Apple would "force" developers to use its payment system to lock in both developers and users on its platform.[2] Over many years, Apple repeatedly has responded to competitive threats like this one by making it harder or more expensive for its users and developers to leave its technological ecosystem and by making it more attractive for them to stay.

3.     For many years, Apple has built a dominant iPhone platform and ecosystem that has driven the company's astronomical valuation. At the same time, it has long understood that disruptive technologies and innovative apps, products, and services threatened that dominance by making users less reliant on the iPhone or making it easier to switch to a non-Apple smartphone. Rather than respond to competitive threats by offering lower smartphone prices to consumers or better monetization for developers, Apple would meet competitive threats by imposing a series of shapeshifting rules and restrictions in its App Store guidelines and developer agreements that would allow Apple to extract higher fees, thwart innovation, offer a less secure or degraded user experience, and throttle competitive

---

[1] *See* "The Steve Jobs email exchange that perfectly captures Apple's strategy," QUARTZ (August 23, 2013), https://qz.com/118293/the-steve-jobs-email-exchange-that-perfectly-captures-apples-strategy (last visited April 13, 2024).

[2] *United States v. Apple Inc.*, No. 2:24-cv-04055 (D.N.J.), Dkt. 1 at 3 (filed Mar. 21, 2024).

alternatives. It has deployed this playbook across many technologies, products, and services, including "super apps," text messaging, smartwatches, and digital wallets, among many others.

4. Apple's conduct also stifles new paradigms that threaten Apple's smartphone dominance, including the cloud, which could make it easier for users to enjoy high-end functionality on a lower priced smartphone—or make users device-agnostic altogether. According to the U.S. government, one Apple manager recently observed, "Imagine buying a [expletive] Android for 25 bux at a garage sale and it works fine . . . . And you have a solid cloud computing device. Imagine how many cases like that there are."[3] Simply put, Apple feared the disintermediation of its iPhone platform and undertook a course of conduct that locked in users and developers while protecting its profits.

5. Apple's anticompetitive conduct not only limits competition in the smartphone market, but also reverberates through the industries that are affected by these restrictions, including financial services, fitness, gaming, social media, news media, entertainment, and more. Unless Apple's anticompetitive and exclusionary conduct is stopped, it will likely extend and entrench its iPhone monopoly to other markets and parts of the economy. For example, Apple is expanding its influence and growing its power in the automotive, content creation and entertainment, and financial services industries–and often by doing so in exclusionary ways that further reinforce and deepen the competitive moat around the iPhone.

## JURISDICTION AND VENUE

6. This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs advance claims under federal law. The Court also has jurisdiction over Plaintiffs' claims for injunctive relief and for attorneys' fees under Section 16 of the Clayton Act, 15 U.S.C. § 26.

7. This Court has personal jurisdiction over Defendant because it is headquartered in this District, and because Plaintiffs' claims arise from and relate to acts committed by Defendant within this jurisdiction.

---

[3] *Id.* at 4.

CLASS ACTION COMPLAINT

8.     Venue is proper in this District because Defendant is headquartered in this District, and because substantial parts of the events and omissions giving rise to the claims occurred in the District.

9.     Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period (defined below), Defendant transacted business in this district, and a substantial portion of the activity at issue in this case occurred in this district, including the anticompetitive designs, testing and implementation of the iPhone. Defendant also maintained its respective principal places of business in this district at all relevant times.

10.    Defendant's conduct alleged herein occurred within the flow of interstate commerce, including in this district, and was intended to and did have a direct and substantial effect upon such commerce.

## **PARTIES**

11.    Plaintiff Zachary Schwartz is a resident of San Diego, California. Plaintiff Schwartz purchased an iPhone 15, in addition to other Apple devices including, for example, an Apple Watch.

12.    Plaintiff Bernadette Lionetta is a resident of Andover, Massachusetts. Plaintiff purchased an iPhone XR, in addition to other Apple devices including, for example, an Apple Watch.

13.    Apple Inc., the designer, manufacturer, and vendor of iPhones, is a California corporation. Apple maintains its headquarters and principal place of business in Cupertino, California. Apple is one of the world's most valuable public companies with a market capitalization over $2.5 trillion. In fiscal year 2023, Apple generated annual net revenues of $383 billion and net income of $97 billion. Apple's net income exceeds any other company in the Fortune 500 and the gross domestic products of more than 100 countries.

14.    The iPhone, Apple's signature product, is the primary driver of Apple's growth and profitability, routinely commanding profit margins of more than 30 percent on devices alone— significantly higher than its smartphone competitors. iPhone sales have made up a majority of Apple's annual revenue every year since 2012.

15.    Apple increasingly extracts revenue from iPhone users beyond the initial smartphone sale. For example, Apple offers iPhone upgrades, apps and in-app payments, paid digital subscription services (e.g., Apple's music streaming, TV, news, gaming, fitness, and cloud storage subscriptions),

accessories (e.g., tracking devices, headphones, chargers, iPhone cases), and more. Apple refers to these offerings as "Services" and "Wearables, Home, and Accessories," respectively. In fiscal year 2023, these offerings accounted for nearly one-third of Apple's total revenue, or four times what Apple earned from selling Mac computers. Some of the largest drivers of revenue within these categories are Apple's smartwatch, the Apple Watch, and Apple's App Store, where iPhone users purchase and download apps. In recent years, Services have accounted for an increasing share of Apple's revenues, while the iPhone has remained the primary gateway through which U.S. consumers access these services.

16.     Apple's U.S. market share by revenue is over 70 percent in the performance smartphone market—a more expensive segment of the broader smartphone market where Apple's own executives recognize the company competes—and over 65 percent for all smartphones. These market shares have remained remarkably durable over the last decade.

## **FACTUAL BACKGROUND**

17.     Today, approximately half of all U.S. smartphone users—more than 100 million—have an Apple iPhone, and there are billions of iPhone users worldwide.

18.     The Apple Computer Company, as it was then called, was founded in 1976 to make and market personal computers. From its inception, Apple had a knack for expensive, high-end design and niche marketing relative to its competitors. But it struggled to compete against rivals that offered lower prices and more programs. After two decades, Apple struggled to compete against Windows personal computers and by the late 1990s, it was on the brink of bankruptcy.

19.     Apple's fortunes changed around the time it launched the iPod in 2001. Innovative design and savvy marketing had not been enough to drive a successful business strategy. This time, the confluence of several factors made it a smash success. Apple's iTunes application allowed iPod users to organize their song library and update their iPod. A path-clearing antitrust enforcement case, brought by the United States and state attorneys general, against Microsoft opened the market and constrained Microsoft's ability to prohibit companies like Apple from offering iTunes on Windows PCs. Licensing agreements with the major music labels allowed Apple to offer iPod/iTunes users a wide selection of music for a fee-per-download. The iPod experience gave Apple a recipe for the

future: a high-end device, a large number of platform participants (i.e., music labels and consumers), and a digital storefront. More importantly, it gave Apple a playbook: drive as many consumers and third-party participants to the platform as possible and offer a wide selection of content, products, and services created by those third parties to consumers. This structure put Apple in the driver's seat to generate substantial revenues through device sales in the first instance and subsequently the ancillary fees that it derives from sitting between consumers, on one hand, and the products and services they love on the other hand.

20.     Apple's experience with the iPod set the stage for Apple's most successful product yet. In 2007, Apple launched the iPhone, a smartphone that offered high-end hardware and software applications, called "apps," built atop a mobile operating system that mimicked the functionality and ease of use of a computer. Apple initially offered only a small number of apps that it created for the iPhone. But Apple quickly realized the enormous value that a broader community of entrepreneurial, innovative developers could drive to its users and the iPhone platform more broadly. So Apple invited and capitalized on the work of these third parties while maintaining control and monetizing that work for itself. The value of third parties' work served an important purpose for Apple.

21.     That strategy paid off. Over more than 15 years, Apple has built and sustained the most dominant smartphone platform and ecosystem in the United States by attracting third-party developers of all kinds to create apps that users could download on their smartphones through a digital storefront called the App Store. As developers created more and better products, content, apps, and services, more people bought iPhones, which incentivized even more third parties to develop apps for the iPhone. Today, the iPhone's ecosystem includes products, apps, content, accessories, and services that are offered by content creators, newspaper publishers, banks, advertisers, social media companies, airlines, productivity developers, retailers and other merchants, and others. As Apple's power grew, its leverage over third parties reinforced its tight control over how third parties innovate and monetize on and off the smartphone in ways that were anticompetitive and exclusionary.

22.     Today, Apple charges as much as $1,599 for an iPhone and earns high margins on each one, more than double those of others in the industry. When developers imagine a new product or service for iPhone consumers, Apple demands up to 30 percent of the price of an app whose content,

product, or service it did not create. Then when a consumer wants to buy some additional service within that app, Apple extracts up to another 30 percent, again for a service Apple does not create or develop. When customers buy a coffee or pay for groceries, Apple charges a fee for every "tap-to-pay" transaction, imposing its own form of an interchange fee on banks and a significant new cost for using credit cards. When users run an internet search, Google gives Apple a significant cut of the advertising revenue that an iPhone user's searches generate.

23. Apple keenly understands that while a community of developers and accessory makers is indispensable to the success of the iPhone, they also pose an existential threat to its extraordinary profits by empowering consumers to "think different" and choose perfectly functional, less-expensive alternative smartphones.

24. Apple's smartphone business model, at its core, is one that invites as many participants, including iPhone users and third-party developers, to join its platform as possible while using contractual terms to force these participants to pay substantial fees. At the same time, Apple restricts its platform participants' ability to negotiate or compete down its fees through alternative app stores, in-app payment processors, and more.

25. In order to protect that model, Apple reduces competition in the markets for performance smartphones and smartphones generally. It does this by delaying, degrading, or outright blocking technologies that would increase competition in the smartphone markets by decreasing barriers to switching to another smartphone, among other things. The suppressed technologies would provide a high-quality user experience on any smartphone, which would, in turn, require smartphones to compete on their merits.

26. Apple suppresses such innovation through a web of contractual restrictions that it selectively enforces through its control of app distribution and its "app review" process, as well as by denying access to key points of connection between apps and the iPhone's operating system (called Application Programming Interfaces or "APIs"). Apple can enforce these restrictions due to its position as an intermediary between product creators such as developers on the one hand and users on the other.

27. Suppressing these technologies does not reflect competition on the merits. Rather, to protect its smartphone monopoly—and the extraordinary profits that monopoly generates—Apple

repeatedly chooses to make its products worse for consumers to prevent competition from emerging. These examples below individually and collectively have contributed to Apple's ability to secure, grow, and maintain its smartphone monopoly by increasing switching costs for users, which leads to higher prices and less innovation for users and developers. Apple has used one or both mechanisms (control of app distribution or control of APIs) to suppress the following technologies, among others:

- Super apps provide a user with broad functionality in a single app. Super apps can improve smartphone competition by providing a consistent user experience that can be ported across devices. Suppressing super apps harms all smartphone users—including Apple users—by denying them access to high quality experiences and it harms developers by preventing them from innovating and selling products.

- Cloud streaming game apps provide users with a way to play computing intensive games in the cloud. Cloud streaming games (and cloud streaming in general) can improve smartphone competition by decreasing the importance of expensive hardware for accomplishing high compute tasks on a smartphone. Suppressing cloud streaming games harms users by denying them the ability to play high-compute games, and it harms developers by preventing them from selling such games to users.

- Messaging apps are apps that allow users to communicate with friends, family, and other contacts. Messaging apps that work equally well across all smartphones can improve competition among smartphones by allowing users to switch phones without changing the way they communicate with friends, family, and others. Apple makes third-party messaging apps on the iPhone worse generally and relative to Apple Messages, Apple's own messaging app, by prohibiting third-party apps from sending or receiving carrier-based messages. By doing so, Apple is knowingly and deliberately degrading quality, privacy, and security for its users and others who do not have iPhones. Apple also harms developers by artificially constraining the size of their user base.

- Smartwatches are an expensive accessory that typically must be paired to a smartphone. Smartwatches that can be paired with different smartphones allow users to retain their investment in a smartwatch when switching phones thereby decreasing the literal cost

associated with switching from one smartphone to another, among other things. By suppressing key functions of third-party smartwatches—including the ability to respond to notifications and messages and to maintain consistent connections with the iPhone—Apple has denied users access to high performing smartwatches with preferred styling, better user interfaces and services, or better batteries, and it has harmed smartwatch developers by decreasing their ability to innovate and sell products.

- Digital wallets are an increasingly important way that smartphones are used and are a product in which users develop a great deal of comfort and trust as they typically contain users' most sensitive information. Digital wallets that work across smartphone platforms allow users to move from one smartphone brand to another with decreased frictions, among other things. Apple has denied users access to digital wallets that would have provided a wide variety of enhanced features and denied digital wallet developers—often banks—the opportunity to provide advanced digital payments services to their own customers.

28. By maintaining its monopoly over smartphones, Apple is able to harm consumers in a wide variety of additional ways. For example, by denying iPhone users the ability to choose their trusted banking apps as their digital wallet, Apple retains full control both over the consumer and also over the stream of income generated by forcing users to use only Apple- authorized products in the digital wallet. Apple also prohibits the creation and use of alternative app stores curated to reflect a consumer's preferences with respect to security, privacy, or other values. These and many other features would be beneficial to consumers and empower them to make choices about what smartphone to buy and what apps and products to patronize. But allowing consumers to make that choice is an obstacle to Apple's ability to maintain its monopoly.

29. Of course, this is not the story Apple presents to the world. For decades, Apple branded itself a nimble, innovative upstart. In 1998, Apple co-founder Steve Jobs criticized Microsoft's monopoly and "dirty tactics" in operating systems to target Apple, which prompted the company "to go to the Department of Justice" in hopes of getting Microsoft "to play fair." But even at that time, Apple did not face the same types of restrictions it imposes on third parties today; Apple users could use their iPod with a Windows computer, and Microsoft did not charge Apple a 30 percent fee for each

song downloaded from Apple's iTunes store. Similarly, when Apple brought the iPhone to market in 2007, it benefited from competition among component makers and wireless carriers.

30.     Apple's anticompetitive conduct comes at a great cost to consumers. Some of those costs are immediate and obvious, and they directly affect Apple's own customers: Apple inflates the price for buying and using iPhones while preventing the development of features like alternative app stores, innovative super apps, cloud-streaming games, and secure texting.

31.     Other costs of Apple's anticompetitive conduct may be less obvious in the immediate term. But they are no less harmful and even more widespread, affecting all smartphone consumers. Apple's smartphone monopoly means that it is not economically viable to invest in building some apps, like digital wallets, because they cannot reach iPhone users. This means that innovations fueled by an interest in building the best, most user-focused product that would exist in a more competitive market never get off the ground. What's more, Apple itself has less incentive to innovate because it has insulated itself from competition. Thus, it is not surprising that Apple spent more than twice as much on stock buybacks and dividends as it did on research and development.

32.     Apple wraps itself in a cloak of privacy, security, and consumer preferences to justify its anticompetitive conduct. Indeed, it spends billions on marketing and branding to promote the self-serving premise that only Apple can safeguard consumers' privacy and security interests. Apple selectively compromises privacy and security interests when doing so is in Apple's own financial interest—such as degrading the security of text messages, offering governments and certain companies the chance to access more private and secure versions of app stores, or accepting billions of dollars each year for choosing Google as its default search engine when more private options are available. In the end, Apple deploys privacy and security justifications as an elastic shield that can stretch or contract to serve Apple's financial and business interests.

33.     Smartphones have so revolutionized American life that it can be hard to imagine a world beyond the one that Apple, a self-interested monopolist, deems "good enough." But consumers, competition, and the competitive process—not Apple alone—should decide what options consumers should have. And competition, not Apple's self-interested business strategies, should be the catalyst for innovation essential to our daily lives, not only in the smartphone market but in closely related

industries like personal entertainment, automotive infotainment, and even more innovations that have not yet been imagined.

**ANTITRUST INJURY AND ANTICOMPETITIVE EFFECTS**

34. Apple's conduct has resulted in less choice for smartphone users. Today, only two companies (Google and Samsung) remain as meaningful competitors to Apple in the premium smartphone market.

35. Apple's conduct has delayed or suppressed the emergence of cross-platform technologies that would put competitive pressure on Apple's ability to extract extraordinary profits from users and developers. For example, third-party digital wallets would reduce Apple's ability to charge banks high fees when users make payments using Apple Wallet, which ultimately cost consumers through higher prices and other reductions in quality. Alternative digital wallets could also provide smartphone users better rewards as well as a more private, secure payment experience from a user's preferred financial institution rather than being forced to go through Apple. These tap-to-pay digital wallet products do not exist today because of Apple's anticompetitive conduct.

36. This leaves all smartphone users worse off, with fewer choices, higher prices and fees, lower quality smartphones, apps, and accessories, and less innovation from Apple and others. It makes iPhone users worse off because they pay higher prices for a smartphone that has less innovation and features, including cross platform technologies described herein.

37. Apple's conduct has made its own products worse, sacrificing the short-term profits Apple could earn from improving the iPhone in order to preserve the long-term value of maintaining its monopoly. In a competitive market, Apple would compete aggressively to support the development of popular apps and accessories for iPhone users, which would in turn make iPhones more attractive to users and more valuable. But Apple takes steps to delay or suppress cross-platform technologies that it recognizes would be popular with users, such as super apps, because of the threat they pose to Apple's smartphone monopoly. As a result, several developers have abandoned plans to develop super apps even after making substantial investments in bringing them to market.

38. Apple has also impeded innovation by third-party smartwatches such that manufacturers have limited the functionality of their smartwatches for iPhone users, suspended support

for iPhone compatibility because of Apple's restrictions, or canceled development of cross-platform smartwatches altogether. At least one company's canceled smartwatch formed part of its overall wearables strategy, including future development of virtual-reality technology. Similarly, Apple degrades third-party messaging apps, even though it makes cross-platform messaging less private and less secure for iPhone users, because doing so raises switching costs.

39. Apple's conduct has harmed other smartphone users, too. Because of the resources and risks required to maintain different features across different smartphones, many potential super app, mini program, and other developers do not implement features prohibited by Apple even on other smartphones. For example, prospective digital wallet providers, including U.S. banks, have abandoned the development of digital-wallet apps for either Apple or other smartphones. Another company decided not to offer users an innovative digital car key in part because Apple required that company to add any features related to the key into Apple Wallet rather than allowing that company to put its key solely in its own app. Other developers have shrunk, shuttered, or abandoned plans to launch super apps, smartwatches, and other apps. As a result, all smartphone users enjoy lower quality smartphones, less innovation, and less choice.

40. Plaintiffs and Class Members purchased iPhones directly from Apple, or from an Apple authorized retailer. Because of the anticompetitive conduct alleged in this Complaint, Plaintiffs and Class members are forced to continue to purchase iPhones and are forced to pay more for those iPhones than they would have absent Apple's alleged monopolization conduct. Apple therefore has caused Plaintiffs and Class members to suffer overcharge damages. Without the unlawful restraints described above, Plaintiffs and Class Members would not have to pay supra competitive price for performance smartphones and smartphones. Apple's anticompetitive practices also stalled, limited or foreclosed competition and innovation in the performance smartphone and smartphone markets.

41. Plaintiffs and Class Members in the Apple Watch Class have been forced to purchase Apple Watches in order to be compatible with their iPhones. The relevant market for the Apple Watch subclass is the smartwatch market for smartwatches that are compatible with Apple's smartphones and performance smartphones, i.e. iPhones. Apple coerces iOS consumers to use and purchase Apple Watches by foreclosing would-be rival smartwatches from connecting with the iPhone. By virtue of

Apple's tying conduct, consumers' only smartwatch option to connect to the iPhone is Apple Watch. Plaintiffs and the Class are locked into purchasing Apple Watches by virtue of their existing purchase of iPhones and pay supra-competitive prices for the Apple Watch.

## SECURITY AND OTHER ALLEGED COUNTERVAILING FACTORS
## DO NOT JUSTIFY APPLE'S ANTICOMPETIVE CONDUCT

42.     There is no valid procompetitive benefits of Apple's exclusionary conduct that would outweigh its anticompetitive effects. Apple's barrier-creating conduct against cross-platform technologies has not resulted in lower prices, higher output, improved innovation or a better user experience for smartphone users.

43.     Apple markets itself on the basis of privacy and security. But this does not justify Apple's monopolistic conduct. In fact, many alternative technologies that Apple's conduct suppresses would enhance user security and privacy.  For example, Apple's conduct targeting digital wallets forces users to share information with Apple even if they would prefer to share that information solely with their bank, medical provider or other trusted third party. When an iPhone user provisions a credit or debit card into Apple Wallet, Apple intervenes in the process that could otherwise occur directly between the user and card issuer introducing another point of failure for privacy and security.

44.     Apple is also willing to make the iPhone less secure and less private if that helps maintain its monopoly power. For example, text messages sent from iPhones to Android phones, it has been reported, are unencrypted as a result of Apple's conduct. If Apple chose it, it could allow iPhone users to send encrypted messages to Android users while still using iMessage on their iPhone, which would improve the privacy and security of iPhone and other smartphone users.

## MARKET DEFINITIONS– THE SMARTPHONE AND SMARTWATCH INDUSTRIES

**A.     Relevant Markets**

45.     All smartphones compete against each other in a broad relevant market. But industry participants, including Apple, assess competition among smartphones in narrower markets that are best understood as submarkets of the larger all-smartphone market. Because Apple chooses not to compete to sell new smartphones in the entry-level tier, the most relevant market to assess its conduct is a

narrower submarket of performance smartphones that excludes this tier. Industry participants recognize performance smartphones as distinct and group these phones into the higher tiers such as "premium" or "flagship."

46.     The second relevant market is the broader smartphone market. Smartphones are different from phones that offer less capable hardware and software options than smartphones. Smartphones are also distinct from other portable devices, such as tablets, smartwatches and laptop computers. Regardless of how the how the smartphone market is drawn, however, Apple's conduct is unlawful.

47.     The relevant market for the Apple Watch subclass is the smartwatch market for smartwatches that are compatible with Apple's iPhones.

**B.     Apple has Monopoly Power in the Relevant Markets**

48.     Apple has monopoly power in the smartphone and performance smartphone markets because it has the power to control prices or exclude competition in each of them. Apple also enjoys substantial and durable market shares in these markets. Moreover, Apple's market shares likely underestimate Apple's power because they are protected by significant barriers to entry, network effects, and switching costs. Apple recognizes and exploits these barriers to entry, network effects, and switching costs to protect itself from competition from rival platforms and innovations, products, and services that may diminish consumer reliance on the iPhone. Apple's power will likely increase over time.

49.     In the U.S. market for performance smartphones, it has been reported that Apple estimates its market share exceeds 70 percent. These estimates likely understate Apple's market share today. For example, Apple's share among key demographics, including younger audiences and higher-income households, is even larger. Even in the broadest market consisting of all smartphones including many smartphones that Apple and industry participants do not view as competing with Apple's iPhones and other higher-end phones— Apple's share is more than 65 percent by revenue. Similarly, even if consumers choose one phone over another, the vast majority of developers consider iPhones and Android devices as complements because developers must build apps that run on both platforms due to the lack of user multi-homing. In effect, the lack of multi-homing among users necessitates multi-

homing among developers. This market reality increases the power that Apple is able to exercise over developers that seek to reach users on smartphones especially performance smartphones that run sophisticated apps.

50.    Apple's high market shares are durable. Over the last decade, Apple increased its share of smartphones sold in the United States most years. Through the same period, Apple collected more than half the revenue for all smartphones sold in the United States.

51.    Apple's monopoly power in the relevant markets is protected by substantial barriers to entry and expansion. For example, since fewer than ten percent of smartphone purchasers in the United States are buying their first smartphone, there are fewer new customers available for Apple's rivals. Instead, rivals must encourage existing iPhone users to switch from using an iPhone to using another smartphone when they replace or upgrade their phone. As a result, switching costs—many created or exacerbated by Apple—impose substantial barriers to entry and expansion for rival smart phones. This barrier is increasingly impenetrable. It has been reported that nearly 90 percent of iPhone owners in the United States replace their iPhone with another iPhone. It has been alleged that at least one U.S. carrier estimates that as high as 98 percent of iPhone users on its network replace or upgrade their iPhone in a given quarter by buying another iPhone. The increased switching costs that consumers experience because of Apple's conduct underpins these exceedingly high retention rates.

52.    Apple's monopoly power in the relevant markets is protected by other barriers to entry, expansion, or repositioning as well. For example, introducing a new smartphone requires considerable investments in acquiring expensive and scarce components such as mobile chips and specialized glass for screens. Other significant barriers to entry include product design, software development, regulatory approval, manufacturing, marketing, and customer service.

53.    Because most smartphones are bought through mobile carriers including Verizon, which has its operations headquarters in this district, new entrants or those seeking to expand or reposition must meet the carriers' technical requirements to access the major carrier networks in the United States. New entrants and smaller rivals must also negotiate distribution agreements and persuade carriers and other retailers to promote their products to consumers. As explained above, rival

smartphones must also overcome the substantial network effects generated by interactions between users, developers, and others who interact with the iPhone.

54.     Apple's iPhone platform is protected by several additional barriers to entry and expansion, including strong network and scale effects and high switching costs and frictions. For example, if an iPhone user wants to buy an Android smartphone, they are likely to face significant financial, technological, and behavioral obstacles to switching. The user may need to re-learn how to operate their smartphone using a new interface, transfer large amounts of data (e.g., contacts), purchase new apps, or transfer or buy new subscriptions and accessories. These switching costs and frictions are even higher when software applications, and other functionality do not help the different devices and operating systems communicate and interoperate. These switching costs and frictions increase the stickiness of the iPhone, making users more beholden to the smartphone manufacturer and platform operator.

55.     Many prominent, well-financed companies have tried and failed to successfully enter the relevant markets because of these entry barriers. It has been reported that past failures include Amazon (which released its Fire mobile phone in 2014 but could not profitably sustain its business and exited the following year); Microsoft (which discontinued its mobile business in 2017); HTC (which exited the market by selling its smartphone business to Google in September 2017); and LG (which exited the smartphone market in 2021). Today, only Samsung and Google remain as meaningful competitors in the U.S. performance smartphone market. It has been alleged that barriers are so high that Google is a distant third to Apple and Samsung despite the fact that Google controls development of the Android operating system.

56.     Apple's monopoly power is separately demonstrated by direct indicia. For example, Apple can and does profitably forego innovation without fear of losing customers to competitors.

57.     Apple's profits and profit margins, for nearly every aspect of the iPhone, are further evidence of Apple's monopoly power. For example, Apple's per-unit smartphone profit margins are far more than its next most profitable rival. Apple charges carriers considerably more than its rivals to buy and resell its smartphones to the public and employs contract clauses that may impede the ability of carriers to promote rival smartphones, a harmful exercise of monopoly power that is hidden to most

consumers. Apple extracts fees from developers as much as 30 percent when users purchase apps or make in-app payments. Apple also extracts a 0.15 percent commission from banks on credit card transactions through its digital wallet, while none of its smartphone competitors with digital wallets charge any fee. Apple predicts that it will collect nearly $1billion in worldwide revenue on Apple Pay fees by 2025.Arecent report by the U.S. Consumer Financial Protection Bureau suggest these revenues will only increase, as "analysts expect the value of digital wallet tap-to-pay transactions will grow by over 150 percent 22 by 2028.

58.     These indicia of Apple's monopoly power are direct evidence of its monopoly power in the relevant markets.

## TOLLING OF STATUTE OF LIMITATIONS

59.     Plaintiffs and Class members had no knowledge of Apple's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the Class period and continuing thereafter, until March 21, 2024 when the Department of Justice filed its Complaint and provided details concerning Apple and its conduct.

60.     Plaintiffs and Class members suffered economic loss due to Apple's wrongful exercise of monopoly power. Plaintiffs' interactions with Apple were insufficient, however, to discover Apple's wrongful conduct.

61.     Furthermore, very little public information was available during the Class period or thereafter that suggests Apple's business activities were done to monopolize the performance smartphone and smartphone market until the Department of Justice filed its antitrust complaint against Apple.

62.     Moreover, it was reasonable for Plaintiffs and Class members not to suspect that Defendant was engaging in any unlawful anticompetitive behavior. Plaintiffs and class members are merely consumers of smartphones and performance smartphones were not active participants in the market.

63.     Plaintiffs allege a continuing course of unlawful conduct by Apple, including conduct within the applicable limitation periods. That conduct has inflicted continuing and accumulating harm within the applicable statutes of limitation.

64. For these reasons, the statutes of limitations applicable to Plaintiffs' and Class members' claims have been tolled with respect to the claims asserted herein until the Department of Justice filed its antitrust complaint against Apple on March 21, 2024.

65. Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims. Plaintiffs and Class members had no knowledge of Apple's wrongful acquisition and maintenance of monopoly power in the relevant markets, or of facts sufficient to place them on inquiry notice of their claims, during the Class period and continuing thereafter. No information in the public domain or otherwise available to Plaintiffs and Class members during the Class period suggested that Apple had wrongfully acquired a monopoly or was using its monopoly power to charge supra-competitive prices.

66. In failing to disclose its wrongful monopolization, in addition to denying it was engaged in such conduct, Apple was able to conceal its illicit conduct.

67. Further, Apple's anticompetitive monopoly conduct was inherently self-concealing because, as Apple knew, its disclosure likely would have led to governmental enforcement activity or civil liability. Apple's conduct is subject to antitrust regulation, so it was reasonable for Plaintiffs and Class members to presume that it was purchasing smartphones and performance smartphones in a competitive market. A reasonable person under the circumstances would not have had occasion to suspect that smartphones and performance smartphones were being sold at supra-competitive prices at any time during the Class period.

## CLASS ACTION ALLEGATIONS

68. Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of the following Class:

1. All persons and entities who, as residents of the United States and during the during the fullest period allowed by law, that purchased a smartphone iPhone, ("Class Period");

2. All persons and entities who, as residents of the United States and during the fullest period allowed by law, that purchased an iPhone performance smartphone; and

3. All persons and entities who, as residents of the United States and during the fullest period allowed by law, purchased any Apple Watch ("Apple Watch class").

69.     Plaintiffs also brings this action individually and as a California class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of the following Class:

4.     All persons and entities, who as residents of California, and during the fullest period allowed by law, that purchased a smartphone iPhone;

5.     All persons and entities, who as residents of California, and during the fullest period allowed by law, that purchased an iPhone performance smartphone;

6.     All persons and entities, who as residents of California, and during the fullest period allowed by law, that purchased any Apple Watch.

70.     These definitions specifically exclude any of the Defendant named herein, any of the Defendant's parent companies, subsidiaries, and affiliates, and any of the Defendant's officers, directors, management, employees, subsidiaries, affiliates or agents. Plaintiffs reserve the right to expand, modify, or alter the class definition in response to information learned during discovery.

71.     This action is properly brought as a class action under Federal Rule of Civil Procedure 23(a) for the following reasons:

a.     **Numerosity**: The proposed Classes are so numerous and geographically dispersed that the joinder of all Class Members is impracticable. While Plaintiffs do not know the exact number and identity of all Class Members, Plaintiffs are informed and believe that there are millions of Class Members. The precise number of Class Members can be ascertained through discovery.

b.     **Ascertainability**: The proposed Classes are ascertainable. The defined Classes consist of purchasers of iPhones and Apple Watches. The identity of these purchases can be determined through records maintained by Defendant, resellers and purchasers.

b.     **Commonality and Predominance**: There are questions of law and fact common to the proposed classes which predominate over any questions that may affect particular Class Members. Such common questions of law and fact include, but are not limited to:

i.     Whether Defendant monopolized the market for smartphones, performance smartphones, or smartwatches;

ii.     Whether Apple unlawfully acquired and maintained monopoly power in the relevant markets;

iii.    Whether Plaintiffs and the other members of the Class were injured by Defendant's conduct and, if so, the determination of the appropriate Class-wide measure of damages;

iv.     Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief;

v.      Whether the alleged conspiracy violated the Sherman Act;

vi.     Whether the alleged conspiracy violated California's antitrust and unfair competition laws;

vii.    Whether Defendant unjustly enriched itself to the detriment of the Plaintiffs and the members of the Class, thereby entitling Plaintiffs and the members of the Class to disgorgement of all benefits derived by Defendant; and

viii.   Whether the Defendant fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Class.

c.      **Typicality**: Plaintiffs' claims are typical of the claims of the members of the proposed Classes. Plaintiffs and the Class have been injured by the same wrongful practices of Defendant. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of the Classes and are based on the same legal theories.

d.      **Adequacy of Representation**: Plaintiffs will fairly and adequately protect the interests of the Classes in that he has no interests antagonistic to those of the other members of the Classes, and Plaintiffs have retained attorneys experienced in antitrust class actions and complex litigation as counsel.

72.     This action is properly brought as a class action under Federal Rule of Civil Procedure 23(b) for the following reasons:

a.      **Declaratory and Injunctive Relief**: Certification under Rule 23(b)(2) is warranted because Defendant acted or refused to act on grounds generally applicable to the

Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

b. **Superiority**: Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Classes predominate over any questions affecting only individual members, and class action of this controversy.

c. The proposed Classes are ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed Class Member were infringed or violated in the same fashion.

73. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a. Given the size of individual Class Member's claims and the expense of litigating those claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

b. This action will promote an orderly and expeditious administration and adjudication of the proposed Class claims, economies of time, effort and resources will be fostered, and uniformity of decisions will be insured;

c. Without a class action, Class Members will suffer damages, and Defendant's violations of law will proceed without remedy while Defendant reaped and retained the substantial proceeds of their wrongful conduct; and

d. Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of Sherman Act -- Monopolization**
**(15 U.S.C. § 2)**
**(Performance Smartphone Class)**

74. Plaintiffs hereby repeat and incorporates by reference each preceding paragraph as if fully stated herein.

CLASS ACTION COMPLAINT

75.     Plaintiffs bring this claim on his own behalf of each member of the Performance Smartphone Class described above.

76.     The relevant market is the U.S. market for performance smartphones, and Apple has monopoly power in that market.

77.     Apple has gained and maintains monopoly power in the relevant market by improper and unlawful means. More specifically, Apple has willfully acquired and maintained such power through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its performance smartphone monopoly.

78.     Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies including, but not limited to, super apps, cloud stream, messaging, wearables and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

79.     While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. Apple's anticompetitive acts have had harmful effects on competition and the performance smartphone class.

80.     Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

81.     For the reasons stated herein, substantial barriers to entry exist in the relevant market.

82.     Apple has the power to exclude competition in the relevant market, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, to maintain and expand its monopoly power in that market.

83.     Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rival competitors in the U.S. market for performance smartphone purchases.

84.     Apple has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for performance smartphone purchases, with the effect being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Further, Apple's actions have depressed output and stifled innovation and options for the classes as alleged herein.

85.     There is no business necessity or other pro-competitive justification for Apple's conduct.

86.     As a direct and proximate cause of Apple's conduct, Plaintiffs and members of the Class have suffered antitrust injury. Plaintiffs and the Class members paid significantly higher prices for performance smartphone purchases than they would have but for Apple's unlawful conduct. That conduct also deprived Plaintiffs and Class members of improved quality and innovation in the relevant markets.

87.     Plaintiffs and members of the Classes are entitled to damages, including treble damages, sustained because of Apple's monopolistic acts and practices.

88.     Plaintiffs and members of the Classes are entitled to equitable relief as appropriate to cure Apple's monopoly conduct and restore competition in the relevant markets. Members of the Classes are regular users in the performance smartphone market, the smartphone market and the smartwatch and will continue to purchase such devices and suffer further injury if Apple's monopoly is not ended.

89.     Plaintiffs and the Classes also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Apple from continuing to charge supra-competitive prices for performance smartphone, smartphone and smart watch prices. *See, e.g.*, 15 U.S.C. § 26.

**SECOND CAUSE OF ACTION**
**Violation of Sherman Act – Attempted Monopolization**
**(15 U.S.C. § 2)**
**(Performance Smartphone Class)**

90.     Plaintiffs hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

91.     Plaintiffs brings this claim on his own behalf and on behalf of each member of the Class described above.

92.     The relevant market is the U.S. market for performance smartphones.

93.     Apple has attempted to monopolize the U.S. performance smartphone market. More specifically, Apple has willfully acquired and maintained market power by its patently exclusionary conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the performance smartphone market.

94.     Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

95.     While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

96.     Apple's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for performance smartphones.

97.     Apple has a specific intent to achieve monopoly power in the U.S. market for performance smartphones. Now, and if its unlawful restraints are not checked, Apple has a dangerous probably of success in the relevant market as defined by the Plaintiffs.

98.     Apple has behaved as alleged herein in an attempt to obtain a monopoly in the performance smartphone market, with the effect being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Additionally, Apple has abused its market power by charging supra-competitive sales of performance smartphones, and making rival companies' performance smartphones operate more badly in hindering cross-platform technologies. Further, Apple's actions have depressed output and stifled innovation and options for the Class as alleged herein.

99. There is no business necessity or other pro-competitive justification for Apple's conduct.

100. Plaintiffs and the Class have been injured, and will continue to be injured, in their property as a result of Apple's conduct, including by way of overpaying for performance smartphones.

101. Plaintiffs are inclined to continue to purchase Apple performance smartphones in the future because of their investment in the Apple platform and the barriers that exist in changing to a rival performance smartphone.

102. Plaintiffs and the Class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Apple from continuing to: charge supra-competitive commission on sales of performance smartphones. *See, e.g.*, 15 U.S.C. § 26.

### THIRD CAUSE OF ACTION
### Violation of Sherman Act -- Monopolization
### (15 U.S.C. § 2)
### (Smartphone Class)

103. Plaintiffs hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

104. Plaintiffs bring this claim on his own behalf and on behalf of each member of the Smartphone Class described above.

105. The relevant market is the U.S. market for smartphones, and Apple has monopoly power in that market.

106. Apple has gained and maintains monopoly power in the relevant market by improper and unlawful means. More specifically, Apple has willfully acquired and maintained such power through an exclusionary course of conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased, maintained, or protected its smartphone monopoly.

107. Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to APIs that have impeded apps and technologies

including, but not limited to, super apps, cloud stream, messaging, wearables and digital wallets. The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances, both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

108. While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process. Apple's anticompetitive acts have had harmful effects on competition and the smartphone class.

109. Apple's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Apple's anticompetitive and unlawful conduct.

110. For the reasons stated herein, substantial barriers to entry exist in the relevant market.

111. Apple has the power to exclude competition in the relevant market, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, to maintain and expand its monopoly power in that market.

112. Apple's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rival competitors in the U.S. market for smartphone purchases.

113. Apple has behaved as alleged herein in an attempt to obtain a monopoly in the U.S. market for smartphone purchases, with the effect being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Further, Apple's actions have depressed output and stifled innovation and options for the classes as alleged herein.

114. There is no business necessity or other pro-competitive justification for Apple's conduct.

115. As a direct and proximate cause of Apple's conduct, Plaintiffs and members of the Class have suffered antitrust injury. Plaintiffs and the Class members paid significantly higher prices for smartphone purchases than they would have but for Apple's unlawful conduct. That conduct also deprived Plaintiffs and Class members of improved quality and innovation in the relevant market.

116. Plaintiffs and members of the Class are entitled to damages, including treble damages, sustained because of Apple's monopolistic acts and practices.

117.    Plaintiffs and members of the Class are entitled to equitable relief as appropriate to cure Apple's monopoly conduct and restore competition in the relevant market. Members of the Class are regular users in the smartphone market and will continue to purchase such smartphones and suffer further injury if Apple's monopoly is not ended.

118.    Plaintiffs and the Class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Apple from continuing to charge supra-competitive prices for smartphone prices. *See, e.g.*, 15 U.S.C. § 26.

**FOURTH CAUSE OF ACTION**
**Violation of Sherman Act – Attempted Monopolization**
**(15 U.S.C. § 2)**
**(Smartphone Class)**

119.    Plaintiffs hereby repeat and incorporates by reference each preceding paragraph as if fully stated herein.

120.    Plaintiffs bring this claim on his own behalf and on behalf of each member of the Class described above.

121.    The relevant market is the U.S. market for smartphones.

122.    Apple has attempted to monopolize the U.S. smartphone market. More specifically, Apple has willfully acquired and maintained market power by its patently exclusionary conduct and the anticompetitive acts described herein. Each of Apple's actions individually and collectively increased Apple's market power in the smartphone market.

123.    Apple's anticompetitive acts include, but are not limited to, its contractual restrictions against app creation, distribution, and access to that have impeded apps and technologies including, but not limited to, super apps, cloud streaming, messaging, wearables and digital wallets .The areas identified in this complaint reflect a non-exhaustive list of recent anticompetitive acts but as technology advances ,both the technologies impeded and the specific manner of impediment may shift in response to technological and regulatory change consistent with Apple's past conduct.

CLASS ACTION COMPLAINT

124.    While each of Apple's acts is anticompetitive in its own right, Apple's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process.

125.    Apple's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for smartphones.

126.    Apple has a specific intent to achieve monopoly power in the U.S. market for smartphones. Now, and if its unlawful restraints are not checked, Apple has a dangerous probably of success in the relevant market as defined by the Plaintiffs.

127.    Apple has behaved as alleged herein in an attempt to obtain a monopoly in the smartphone market, with the effect being that competition is foreclosed, innovation is stifled, and consumer choice is gravely diminished. Additionally, Apple has abused its market power by charging supra-competitive sales of smartphones, and making rival companies' smartphones operate more badly in hindering cross-platform technologies. Further, Apple's actions have depressed output and stifled innovation and options for the Class as alleged herein.

128.    There is no business necessity or other pro-competitive justification for Apple's conduct.

129.    Plaintiffs and the Class have been injured, and will continue to be injured, in their property as a result of Apple's conduct, including by way of overpaying for smartphones.

130.    Plaintiffs are inclined to continue to purchase Apple smartphones in the future because of their investment in the Apple platform and the barriers that exist in changing to a rival smartphone.

131.    Plaintiffs and the Class also are entitled to injunctive relief to prevent Apple from persisting in its unlawful, inequitable, and unjustified behavior to their detriment, with such an injunction at a minimum prohibiting Apple from continuing to: charge supra-competitive commission on sales of smartphones. *See, e.g.*, 15 U.S.C. § 26.

# FIFTH CAUSE OF ACTION
## Violation of Sherman Act –Tying
### (15 U.S.C. §§ 1, 3)
### (Apple Watch Class)

132.     Plaintiffs hereby repeat and incorporates by reference each preceding paragraph as if fully stated herein.

133.     Apple has unlawfully tied Apple Watch to its mobile devices, namely the iPhone.

134.     As demonstrated above, the Apple Watch is a product in the market of smartwatches compatible to Apple iPhones. This market is distinct from the relevant market from Apple's smartphone and performance smartphone markets. Apple's unlawful tying arrangement thus ties two separate products and that are separate markets.

135.     Apple exercise market power in the smartphone and performance smartphone markets (collectively called "iPhone").

136.     Apple coerces iOS consumers to use and purchase Apple Watches by foreclosing would-be rival smartwatches from connecting with the iPhone.  By virtue of Apple's tying conduct, consumers' only smartwatch option to connect to the iPhone is Apple Watch.

137.     Apple's conduct forecloses competition in the market for smartwatches compatible with Apple iPhones. Given the value and transactions and the money at issue, Apple's conduct affects a substantial violation of commerce in that market.

138.     Apple has thus engaged in a per se illegal tying arrangement.

139.     In the alternative only, even if Apple's tying conduct does not constitute a per se violation of the law, the rule of reason analysis of Apple's tying arrangement also would demonstrate that it violates the law.

140.     There is no valid business necessity or pro-competitive justification for Apple's tying conduct.

141.     Plaintiffs and the Apple Watch Subclass have been injured, and will continue to be injured, in their business and property as a result of Apple's conduct, including by overpaying for smartwatches for Apple's iPhones.

142.     Plaintiffs and members of the putative class have suffered and continue to suffer damages and irreparable injury, including ongoing harm to their business, and such damages and injury will not abate until the Court issues an injunction ending Apple's anticompetitive issues.

**SIXTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law**
**(Cal. Business and Professions Code § 17200, *et seq.*)**
**(Limited to California iPhone and Apple Watch Subclasses)**

143.     Plaintiffs hereby repeat and incorporates by reference each preceding paragraph as if fully stated herein.

144.     Apple's conduct is unlawful in violation of California's Unfair Competition Law ("UCL") because it violates Section 2 of the Sherman Act, 15 U.S.C. § 2 (monopolization), and 15 U.S.C. §§ 1, 3 (tying).

145.     Apple has engaged in unfair business practices through the conduct alleged herein, which has restrained competition. Apple's conduct is unfair and in violation of the UCL because it violates California's clearly established public policy forbidding monopolistic acts. Apple wrongfully acquired and unlawfully maintained monopoly power in the relevant markets through the conduct alleged herein.

146.     Apple's practices also are unlawful in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including in the form of artificially inflated prices, that greatly outweighs any possible utility from the practices.

147.     Apple's conduct is unfair in violation of California's Unfair Competition Law because it deprives consumers of innovation in technology, encourages substandard products in the relevant markets by Apple's competitors. Apple's conduct is unfair because it provides barriers that prevent consumers from more seamless cross-platform technology. Apple's conduct is also unfair because it violates the policy and spirit of the antitrust laws to prevent monopolistic behavior that hinders consumers choice and supra-competitive prices.

148.     Apple's conduct actually and proximately caused Plaintiffs and Class members to lose money or property. On behalf of the Class, Plaintiffs seeks damages, injunctive relief, and reasonable attorneys' fees and costs, as well as any other relief the Court may deem just or proper.

149.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and Class members seek from Defendant restitution and disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by Defendant for its violations of the UCL.

150.     Plaintiffs and the Class remain at risk of future harm and injury unless the challenged practices, described above, are modified and enjoined. Pursuant to Cal. Bus. & Prof. Code § 17203, on behalf of the Class, Plaintiffs seek an injunction prohibiting Defendant from continuing its unlawful practices.

151.     Plaintiffs, on behalf of the general public of the State of California and pursuant to Cal. Bus. & Prof. Code § 17203 and *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), seek a court order for public declaratory and injunctive relief to enjoin Defendant from such future misconduct, and any other such order that may be necessary to prevent future harm and financial injury to members of the general public who have not yet transacted with Defendant but are likely to in the future. As set forth above, the general public is in need of protection from Defendant's ongoing and continuing violations of the UCL. Such relief will create a public benefit. Plaintiffs thus bring this action for public declaratory and public injunctive relief as a private attorney general and to vindicate and enforce important rights affecting the public interest. Plaintiffs are therefore entitled to an award of attorneys' fees and costs under Cal. Code of Civ. P. § 1021.5 for bringing this action for public declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on his behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

1.     That the Court determine that this action may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4) that Plaintiffs be certified as Class representatives, and Plaintiffs' counsel be appointed as counsel for the Class;

2.      That the unlawful contract, combination, or conspiracy alleged be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 2 of the Sherman Act;

3.      That Defendant has violated the UCL by engaging in conduct that constitutes unlawful, unfair and fraudulent business practices;

4.      That Plaintiffs and the Class have been injured in their business and property as a result of Defendant's violations;

5.      That Plaintiffs and the Class recover damages, as provided by law, determined to have been sustained as to each of them, in an amount to be trebled in accordance with the antitrust laws, and that judgment be entered against Defendant on behalf of Plaintiffs and the Class;

6.      Plaintiffs and the Class recover their costs of suit, including reasonable attorneys' fees, costs, and expenses of the lawsuit, as provided by law;

7.      That Defendant, its subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

8.      That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

9.      That Plaintiffs and the Class are entitled to equitable relief appropriate to remedy Defendant's past and ongoing restraint of trade, including:

i.      A judicial determination declaring the rights of Plaintiffs and the Class, and the corresponding responsibilities of Defendant; and

ii.     Issuance of a permanent injunction against Defendant and their parents, subsidiaries, affiliates, successors, transferees, assignees and the Respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from violations of the law as alleged herein.

1      10.    That Defendant is to be jointly and severally responsible financially for the costs and

2    expenses of a Court-approved notice program through post and media designed to give immediate

3    notification to the Class; and

4      11.    For such other and further relief as is just under the circumstances.

5                          **<u>DEMAND FOR JURY TRIAL</u>**

6    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs and the Class demand a trial by

7    jury of all the claims asserted in this complaint that are so triable.

8

9    Dated: April 13, 2024                    Respectfully submitted,

10

11                                           */s/ Tina Wolfson*
                                             Robert Ahdoot (SBN 172098)
12                                           rahdoot@ahdootwolfson.com
                                             Tina Wolfson (SBN 174806)
13                                           twolfson@ahdootwolfson.com
                                             Theodore W. Maya (SBN 223242)
14                                           tmaya@ahdootwolfson.com
                                             Christopher E. Stiner (SBN 276033)
15                                           cstiner@ahdootwolfson.com
16                                           **AHDOOT & WOLFSON, PC**
                                             2600 W. Olive Avenue, Suite 500
17                                           Burbank, CA 91505
                                             Telephone: (310) 474-9111
18                                           Facsimile:  (310) 474-8585

19                                           *Class Counsel for Plaintiffs and the Proposed Class*

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT